IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JOHN SEMBRANO,<br><br>　　　　　Defendant. | Case No. 19-cr-00651-CRB-1<br><br>**ORDER DENYING MOTION TO SUPPRESS AND FRANKS HEARING** |

Defendant John Sembrano moves the Court to either hold a hearing under Franks v. Delaware, 438 U.S. 154 (1978), or suppress evidence found during a search of his home at Unit A, 34 Williams Avenue, San Francisco. See Mot. (dkt. 52) at 30. Because Sembrano's factual account does not justify suppressing the evidence, the Court denies Sembrano's motion.

## I.   BACKGROUND

### A.   Underlying Events

The Williams building is a two-story apartment building located at the corner of Williams Avenue and Lucy Street in San Francisco. See Anderson Decl. (dkt. 45) Ex. A. Unit A is the second story unit, with Unit B beneath it. Anderson Decl. at 2. The Unit A entrance is at the top of a staircase beginning on Williams Avenue. Id.



See Anderson Decl. Ex. C-1 (annotations added).

The San Francisco Ice Company is directly across Williams Avenue from the Williams building.  See Anderson Decl. at 2.  A Walgreens store is one lot east of the Ice Company.  Anderson Decl. Ex. B.  A dirt strip running along the eastern side of the Ice Company separates the Ice Company from the Walgreens parking lot.  Anderson Decl. at Ex. H-1; see also Anderson Decl. Ex. B.



Anderson Decl. Ex. B.

The Ice Company has three relevant security cameras—Camera 3, Camera 10, and Camera 11. Camera 3 is on the northern wall of the Ice Company, placed on the eastern corner and facing northwest towards Williams Avenue. Elseth Decl. (dkt. 62) at 1. Camera 10 is on the northern wall forty yards west of Camera 3, facing northeast. Id. at 2. Camera 11 is on the eastern wall of the Ice Company and captures the dirt strip. See id. at 1–2.

Sembrano agrees with, or does not dispute, the following facts. Mot. at 3–12.

On March 23, 2019, at 12:02 AM, San Francisco Police Department ("SFPD") officers responded to a radio call for a ShotSpotter activation near the Walgreens. See Falk Decl. (dkt. 47) Ex. O at JS-26.[1] SFPD found four fired cartridge casings in the Walgreens parking lot near the East building line of the Ice Company. See id. Two

---

[1] ShotSpotter is a system of acoustic sensors which detect gunfire-like sound. See Elseth Decl. at 9–10; Enhance Public Safety and Site Security with ShotSpotter, SHOTSPOTTER, https://www.shotspotter.com (last visited Nov. 2, 2020).

3

witnesses confirmed that they heard gunshots in the area.  Id.

On March 26, 2019, SFPD Sergeant Matthew Elseth went to the scene and reviewed the Ice Company surveillance footage.  Elseth Decl. at 1.  The footage shows a black SUV park in front of the Williams building.  Falk Decl. Ex. P. at 23:56:45–23:57:00.  The driver exits the vehicle and walks up the stairs to Unit A.  Id. at 23:57:32–23:57:43.  About a minute later, two more individuals exit the vehicle and climb the stairs.  Id. at 23:58:43–23:58:59.  Shortly thereafter, an unknown male exits the rear driver side of the vehicle and runs across Williams Avenue.  Id. at 23:59:10–23:59:26.  His hands are in the front pocket of his hooded sweatshirt.  See id. at 23:59:10–23:59:26.  The unknown male moves along the Ice Company's east wall then disappears from view.  Falk Decl. Ex. S at 23:59:29–23:59:32.  The recording shows one flash of light in the area toward which the unknown male had been walking.  See id. at 23:59:36.  After the flash the unknown male reappears.  See id. at 23:59:39–23:59:42.  Camera 3 records the unknown male run across Williams Avenue and into Unit A.  Falk Decl. Ex. P at 23:59:44–23:59:56.

### B.  The Search Warrant

On April 8, 2019, Elseth applied for a warrant to search both Unit A and Unit B of the Williams building for evidence relating to the March 22 incident, including the unknown male's firearm and sweatshirt.  Elseth Decl. Ex. 3.  The following affidavit ("Elseth Affidavit") supported Elseth's warrant application.  Id.  Sembrano contends that the affidavit contained numerous false statements, which are underlined below.

Summary:

On 3/23/19 officers responded to 3rd St and Williams Ave regarding possible gun shots in the area.  <u>Officers canvased the area and located 40cal fired casings in the Walgreens' parking lot, 5300 3rd St, near the East building line of 45 Williams Ave.</u>[2]

One witness saw an unknown male running from the Walgreens' parking lot and enter 34 Williams Ave.  Another witness saw a light colored SUV flee

---

[2] Sembrano asserts that these casings were found in the dirt strip abutting the Ice Company, not the parking lot.  Mot. at 4.

E/B Wallace Ave.

Investigation:

An independently owned video surveillance system was recovered that captured the incident.

Video Summary:
Video from 45 Williams Ave (SF Ice Company) :
2357Hrs: A Blk SUV, possible Tahoe, drives S/B Lucy St to W/B Williams Ave the vehicle immediately pulled over in front of 34 Williams Ave. The male driver ran into the second story entrance to 34 Williams Ave, unit A.

2348Hrs: Two unknown passengers exit the passenger's side of the vehicle and run into the second story entrance to 34 Williams Ave, unit A.

2359Hrs: An unknown male exits the rear driver's side of the vehicle and runs to the south side of Williams St, toward 5300 3rd St (Walgreens). <u>The unknown male is seen holding his waistband</u> as he runs across the street.[3]

23:59:25Hrs: the unknown male is seen running along the east building line of 45 Williams Ave. At this point <u>three flashes</u> can be seen from the area the male is seen that resembles the muzzle flash of a firearm.[4] The unknown male is seen running across Williams Ave to the north side of the street <u>as he conceals an unknown object into his waistband.</u>[5] The male flees into the second story entrance to 34 Williams Ave, unit A.

The unknown male is a dark skinned male wearing a dark hoodie with a white square shaped logo on the front and light colored pants.

3/23/19
0011Hrs: <u>two unknown residents from unit B are seen leaving unit B and walking up the stairs to unit A.</u>[6]

An Accurint database search revealed that the last name of residents associated with 34 Williams Ave is associated with both unit A and B.

---

[3] Sembrano argues that the unknown male has his hands in his pockets and is not holding his waistband. Mot. at 7–12, 20–21.
[4] Sembrano argues that the camera captures only one flash. Mot. at 10.
[5] Sembrano argues that "[t]he video shows no such thing as the unknown male runs back across Williams Ave." Reply (dkt. 63) at 4 (citing Falk Decl. Ex. P at 23:59:44–23:59:53; Falk Decl. Ex. R. at 23:59:42–23:59:50).
[6] Sembrano argues that no camera could possibly have captured two people leaving Unit B because no camera shows Unit B's door. See Mot. at 11–12.

5

> <u>A records check revealed that Sheldon Mean, a resident associated with 34 Williams Ave, has a Smith & Wesson 40 Cal handgun . . . registered to him.</u>[7] Due to the fact that 40 Cal casings were recovered at the initial incident it is likely that this firearm may be involved, therefore this firearm may have evidentiary value. . . .
>
> Based on the video surveillance I believe that an unknown <u>resident</u> at 34 Williams Ave committed the following <u>felony offense</u> of 246.3PC (negligently discharging a firearm in public).[8]  Based on the fact that the firearm has not been recovered and the fact that the shooting [occurred] approximately <u>10 days</u> prior it is likely that the unknown resident is still in possession of the firearm that was used.[9]  I believe that granting this search warrant will provide additional evidence that the unknown resident was involved in this case and in possession of the firearm.
>
> Through my training and experience I know that subjects who possess firearms often keep them near their persons at all times of the day and night which is a major officer safety issue.

Elseth Decl. Ex. 3 at JS-133–34.

San Francisco Superior Court Judge Haines issued the search warrant the same day. Elseth Decl. at 11.

### C.     The Search, Arrest, and Charges against Sembrano

SFPD officers executed the search warrant on April 9, 2019, seventeen days after the late March 22 and early March 23 incident. Elseth Decl. Ex. 4 at JS-10.  In Sembrano's Unit A bedroom, officers found a Kimber Micro nine-millimeter firearm. <u>Id.</u> at JS-20–21.  Sembrano, who had previously been convicted of a felony, was arrested and charged with being a Prohibited Person in Possession of a Firearm under California Penal

---

[7] Sembrano argues that the Accurint report revealed only that Mean was associated with the Williams building, not that Mean was a resident there, and that Mean was associated only with Unit B. <u>See</u> Mot. at 18–19; Reply at 6; Falk Decl. Ex. T.  Further, Mean was at least concurrently residing at a Santa Rosa, California address and the firearm was registered at that address. Mot. at 18–19; Falk Decl. Exs. L, U.

[8] Unlike the other underlined statements, this statement consists of a debatable inference and a legal conclusion, rather than a disputed fact.  Sembrano argues that Elseth did not have probable cause to conclude that the unknown male was a resident of the Williams building, Mot. at 23–26, and that no felony offense was committed. Mot. at 28–30.

[9] As Sembrano points out, the underlying events occurred the night of March 22 and early morning of March 23, and Elseth did not submit this affidavit until April 8. <u>See</u> Falk Decl. Ex. O at JS-23; Elseth Decl. Ex. 3 at JS-135.

6

Code section 29800(a)(1).  Id. at JS-10.  On December 5, 2020, a Federal grand jury returned an indictment charging Sembrano with being a Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(1).  Indictment (dkt. 1) at 1–3.

Sembrano now moves the Court to hold an evidentiary hearing under Franks v. Delaware or to suppress the evidence found during the search.  See Mot. at 30.  Sembrano argues that once all misrepresentations are removed from Elseth's affidavit, there was not probable cause to search Unit A because there was not probable cause that the unknown male seen in the security footage resided in Unit A.  See Mot. at 21–27; Reply at 7–17. Sembrano also argues that no felony offense occurred on March 22, and therefore no search warrant should have issued under California law.  Mot. at 28–29; Reply at 17–19.

## II.   LEGAL STANDARD

### A.   Motion to Suppress Evidence

The Fourth Amendment recognizes a "right of the people . . . against unreasonable searches and seizures."  U.S. Const. Amend. IV.  Unless an exception applies, the exclusionary rule prevents unlawfully obtained evidence from being introduced at trial against the person whose Fourth Amendment rights were violated.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961).  This includes other evidence "come at by exploitation" of the illegality.  Wong Sun v. United States, 371 U.S. 471, 488 (1963).

### B.   Franks Hearing

The Ninth Circuit has set out a five-prong test that a defendant must meet to justify a Franks hearing:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; (5) the challenged statement must be necessary to find probable cause.

United States v. Perdomo, 800 F.2d 916, 920 (9th Cir. 1986) (internal citation omitted); see also United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir. 1985) (any "false

7

statements must be material to a finding of probable cause."). Thus, if a warrant affidavit contains deliberate or reckless falsehoods, the Court excises those falsehoods to determine if probable cause exists without them. United States v. Reeves, 210 F.3d 1041, 1044 (9th Cir. 2000).

## III.   DISCUSSION

Taking the facts as Sembrano presents them, there was probable cause to search Sembrano's apartment building unit because a person who had just unlawfully discharged a firearm ran directly into that unit, and this probable cause did not go stale after seventeen days. Therefore, the Court denies Sembrano's motion to suppress the evidence found in Unit A. And because there was probable cause without considering the statements that Sembrano challenges in the affidavit, the Court denies Sembrano's motion for a Franks hearing.

### A.   Probable Cause

Police may lawfully search a constitutionally protected area like a home when they have a warrant supported by probable cause. See Katz v. United States, 389 U.S. 347, 357–58 (1967). Probable cause exists when "the known facts and circumstances" would give a person of reasonable prudence "the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996). Probable cause "requires only a probability or substantial chance" that evidence will be found. District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quoting Illinois v. Gates, 462 U.S. 213, 243–44 n.13 (1983)).

A suspect need not live at a residence for police to have probable cause to search that residence. All that matters is whether there is "a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Ruiz, 758 F.3d 1144, 1148 (9th Cir. 2014) (quoting United States v. DeLeon, 979 F.2d 761, 764 (9th Cir. 1992)). Of course, if there was "no apparent connection between the suspect and the searched premises, or the suspect engaged in only casual daytime visits to the premises," there may not be a fair probability that evidence will be found there. United States v.

Winn, 811 F. App'x 1011, 1013–1014 (9th Cir. 2020) (citing United States v. Grandberry, 730 F.3d 968, 976–78 (9th Cir. 2013); Greenstreet v. Cty. of San Bernardino, 41 F.3d 1306, 1309–10 (9th Cir. 1994); United States v. Bailey, 458 F.2d 408, 412 (9th Cir. 1972)).

The Court takes the facts as Sembrano presents them. Without the challenged statements, Sergeant Elseth's affidavit indicates that the unknown male (1) exited a vehicle that had just parked in front of Unit A, (2) ran across the street to the same area that a flash resembling a muzzle flash was seen, where witnesses heard gunshots, and where four fired cartridges were later found, and (3) fled into Unit A. See Elseth Decl. Ex. 3. Three other people exited the same vehicle and entered Unit A minutes before the unknown male exited the vehicle. Id.

This is enough for probable cause. There is a substantial chance that just before running directly into Unit A, the unknown male unlawfully discharged a firearm. For that reason alone, there was a fair probability that evidence of the incident would be found in Unit A. Sembrano argues that without probable cause that the unknown male resided in Unit A, there was no probable cause to search Unit A. Reply at 7–17. But Sembrano cites no authority requiring that a suspect live in a residence to establish probable cause that evidence of a crime will be found there, and such a requirement would not make sense. A reasonable nexus between a suspect, a crime, and a residence requires only "that it would be reasonable to seek the evidence in the place indicated in the affidavit." United States v. Pitts, 6 F.3d 1366, 1369 (9th Cir. 1993) (citations omitted). The Ninth Circuit has required probable cause that a suspect resides in a particular place only in the absence of an otherwise obvious connection between the crime that occurred, the suspect, and the place at which the suspect is later observed. See, e.g., United States v. Bailey, 458 F.2d 408, 412 (9th Cir. 1972) (addressing an affidavit stating that the defendant "had been seen at the house and that [a co-defendant] was arrested there" six weeks after the crime—committed elsewhere—for which evidence was sought). Here, there was a direct connection between the suspect, the crime, and the residence.

9

Sembrano's argument that <u>Crews</u> and <u>Winn</u> require a different conclusion fails. See Reply at 11–15. Most obvious, neither <u>Crews</u> nor <u>Winn</u> excluded evidence based on a holding that police officers lacked probable cause to search a residence. See <u>United States v. Crews</u>, 502 F.3d 1130, 1140–41 (9th Cir. 2007); <u>Winn</u>, 811 F. App'x at 1013. <u>Crews</u> relied on the "good faith" exception to the probable cause requirement without "embarking on the exercise of determining whether the affidavit supported probable cause." 502 F.3d at 1136. <u>Winn</u> held that there was probable cause to search an apartment after police observed a suspect there "several days after" a shooting. 811 F. App'x at 1013–14. Furthermore, <u>Crews</u> and <u>Winn</u> involved less direct connections between the evidence officers sought and the residences the officers searched. See <u>Crews</u>, 502 F.3d at 1133–34; <u>Winn</u>, 811 F. App'x at 1013–14.[10] The suspects in <u>Crews</u> and <u>Winn</u> did not enter the searched dwellings immediately after committing crimes. See <u>Crews</u>, 502 F.3d at 1133–34; <u>Winn</u>, 811 F. App'x at 1013–14. By contrast, here the unknown male ran directly into Unit A seconds after committing an apparent crime. Falk Decl. Ex. P at 23:59:10–23:59:26, 23:59:44–23:59:56; Falk Decl. Ex. S. at 23:59:29–23:59:42.

Probable cause did not become stale or otherwise disappear between the March 22 incident and the April 9 search. Although "information offered to support a search warrant application becomes stale when enough time has elapsed such that there is no longer sufficient basis to believe . . . that the items to be seized are still on the premises," <u>United States v. Grant</u>, 682 F.3d 827, 835 (9th Cir. 2012) (quotations omitted), "[o]ne may infer that equipment acquired to accomplish a crime will be kept for some period of time," <u>Crews</u>, 502 F.3d at 1140 (citation omitted). No Ninth Circuit case has held that probable cause to search for a firearm goes stale after seventeen days, and the case law suggests the opposite. In <u>United States v. Collins</u>, law enforcement searched Collins's home six weeks after receiving a tip that placed illegal firearms there. 61 F.3d 1379, 1384 (9th Cir. 1995). The tip, combined with older information regarding Collins's possession of firearms, was

---

[10] The Court also notes that while the Court agrees with <u>Winn</u>'s reasoning, it is unpublished and not binding. <u>Winn</u>, 811 F. App'x 1011.

10

enough for probable cause. See id. at 1384–85 (collecting cases). Crews held that evidence of Crews's alleged firearm possession had not gone stale after twelve days, noted the absence of any known "case where staleness was found in such a short period of time," and held that it was reasonable to believe evidence of firearm possession would still be present in his apartment. See Crews, 502 F.3d at 1140.

Sembrano relies on Grant to argue that there is no reason to think that either the unknown male or his firearm would still be in Unit A seventeen days after the crime. Suppl. Br. (dkt. 67) at 7–8. But Grant is yet another case without a direct connection between a crime, a suspect, and a location. A suspect entered Grant's home six months after the underlying crime, and the police did not search Grant's home for another two months after the suspect left. 682 F.3d at 835. There was no reason to believe the suspect brought evidence of his crime with him, or if he did, that it would still be there two months later. Id. Here, there is good reason to believe that immediately after committing a crime, a suspect entered Unit A with evidence of that crime, and that the evidence might still be there seventeen days later.

### B.     Franks Hearing

No Franks Hearing is warranted because, as the above analysis shows, none of Sembrano's "challenged statements" in the warrant affidavit were "necessary to find probable cause." Perdomo, 800 F.2d at 920.[11]

---

[11] The Court also rejects Sembrano's argument that in California, search warrants can only issue for "crimes that fall under Cal. Penal Code § 1524—most generally felonies," and no felony occurred here. Mot. at 28–29. The elements of an offense under section 246.3(a) are: "(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; (3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person." People v. Ramirez, 201 P.3d 466, 469 (Cal. 2009) (citing People v. Alonzo, 16 Cal. Rptr. 2d 656, 659 (Cal. Ct. App. 1993)). When a defendant is convicted of violating section 246.3(a), "the trial judge has the discretion to sentence either as a misdemeanor or a felony." People v. Leslie, 54 Cal. Rptr. 2d 545, 546 (Cal. Ct. App. 1996). "It is beyond dispute that shooting a gun in a commercial area where people are present constitutes gross negligence" under the statute. Ramirez, 201 P.3d at 471. Based on Sembrano's own factual account, there was probable cause that the unknown male violated section 246.3(a) when he discharged his firearm in a commercial part of San Francisco with people present at least to the extent that there were witnesses in the area. See Falk Decl. Ex. O at JS-26. This supports the magistrate's finding that the evidence sought "was used as the means of committing a felony." Elseth Decl. Ex. 3 at JS-131.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Sembrano's motion to suppress and motion for a Franks hearing.

**IT IS SO ORDERED.**

Dated: November 12, 2020



CHARLES R. BREYER
United States District Judge